Filed 8/13/26  P. v. Madrid CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084822 |
| Plaintiff and Respondent, | |
| v. | (San Diego Super. Ct. No. SCD296850) |
| ALEJANDRO ARMANDO MADRID, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Reversed in part, affirmed in part.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel Rogers and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

Alejandro Armando Madrid and Walter Bailey were two transient men who happened upon each other in the middle of the night in an otherwise quiet neighborhood. In their first interaction, Bailey approached Madrid near a gated apartment complex and demanded access. Madrid pulled out his gun, racked a round, and told Bailey to get away from him. The men parted ways, but nearly an hour later and a half mile away, their paths crossed again. This time, Bailey spotted Madrid and threw rocks at him. Madrid again pointed his gun at Bailey to ward him off, but Bailey continued to approach and began swinging a chain-and-lock at Madrid. Madrid fired one shot at Bailey, killing him, and immediately fled the area. Madrid claimed he shot Bailey in self-defense, but the jury convicted him of murder.

On appeal, Madrid claims the trial court erred by instructing the jury that a person may lose the right to self-defense if he was the initial aggressor or a mutual combatant (CALCRIM No. 3471), or if he contrived the claim as a pretext to assault the victim (CALCRIM No. 3472). Madrid argues that given the evidence in this case, no reasonable jury could find these instructions applicable. For reasons we explain, we agree. Although the error was harmless as to the instructions on mutual combat and contrived self-defense—as the jury was readily able to see the irrelevance of these instructions—the record reveals a reasonable likelihood that the jury was misled by the initial aggressor instruction. We therefore reverse Madrid's murder conviction and remand for retrial.

## FACTUAL AND PROCEDURAL BACKGROUND

Around midnight on October 16, 2022, a resident of the Smoke Tree condominium complex on Adobe Falls Road heard a gunshot. He went outside to investigate and discovered Bailey lying on the ground with a

2

gunshot wound in his chest and a chain-and-lock beside him.  The resident called 911 right away.  Police responded within minutes but were unable to revive Bailey.  The bullet had traveled through his heart and came to rest in his spine.  There was no soot or stippling on his body, indicating he was not shot at close range.  An autopsy later revealed there was methamphetamine in his system at the time of his death.

The police collected surveillance video from residences, a hotel, and a construction site along Adobe Falls Road.  The videos captured Madrid and Bailey in the area.  At 11:25 p.m., Madrid is seen walking near the hotel and construction site, which were about a half mile west of the crime scene.  Five or six minutes later, Bailey is seen walking in the same area, headed in the same direction.  Around 12:30 a.m., Madrid is seen in the Smoke Tree complex, very close to the crime scene.  The sound of the gunshot was recorded at 12:38 a.m.

The police used a still image of Madrid from one of the surveillance videos to administer a " 'Be On The Lookout' " flier.  In early November 2022, Amanda H. contacted the police and told them that her ex-boyfriend, Madrid, had killed Bailey.

According to Amanda, about a week after the shooting, Madrid asked to speak with her urgently.  When she met up with him, he blurted out, " 'I killed him,' " and showed her an online news article about the shooting.  Madrid explained to Amanda that he had just climbed over a gate to access an apartment complex when Bailey—who was big, scary, and looked to be on drugs—approached him and demanded the code to get in.  Believing Bailey was going to beat him up, Madrid pulled out his gun, pointed it at Bailey, and told Bailey to leave him alone.  Both men walked away.  Sometime later, Bailey started throwing rocks at Madrid.  Madrid was scared that Bailey was

3

going to rob him or hurt him, so he "turned around and shot" Bailey and then ran away. Although he was aiming for Bailey's chest, he thought he had shot him in the leg. Amanda asked Madrid how he felt about having killed someone. He replied, " 'What the fuck you mean? It was either him or me.' " He told her it was self-defense.

Two days after receiving Amanda's tip, the police located Madrid and arrested him. The gun used to kill Bailey was found inside a backpack that Madrid was wearing at the time of his arrest.

The prosecution charged Madrid with murder (Pen. Code,[1] § 187, subd. (a); count 1) and alleged that he personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).[2] It was further alleged that he suffered one prior serious felony (§ 667, subd. (a)) and one prior strike (§§ 667, subds. (b)–(i)/1170.12). Several aggravating sentencing factors were asserted as well.

At trial, Madrid maintained his self-defense claim. He testified that the night of the shooting he was "snooping around" looking for cars to break into. He was in the parking lot outside of a gated apartment complex at the west end of Adobe Falls Road when Bailey walked up to him. Bailey was large—about 5 inches taller and 60 pounds heavier than Madrid—and

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     In a consolidated information, the prosecution filed several additional charges against Madrid for offenses he allegedly committed around the time of the murder—namely, assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), corporal injury to a dating partner (§ 273.5, subd. (a); count 3), shooting at an occupied building (§ 246; count 5), burglary of an inhabited building with a nonaccomplice present (§§ 459, 462, subd. (a), 667.5, subd. (c)(21); count 6), and two counts of unlawful firearm possession (§ 29800, subd. (a)(1); counts 4 & 7). The events leading to these other charges are not relevant to the issue raised on appeal.

4

appeared to be on drugs. With an aggressive tone, Bailey demanded that Madrid let him into the complex: " 'Let me in this motherfucker.' " Madrid replied that he did not live there or know how to get in. When Bailey insisted, Madrid pulled his gun from his waistband, racked it, pointed it at Bailey, and told him to "get the fuck away from [him]." By this point, the men were about 10 feet apart. Bailey relented and walked away. Madrid put his gun away, dusted himself off, and proceeded east down Adobe Falls Road.

Madrid walked past the hotel and construction site and entered the Smoke Tree complex, where he eventually hit a dead end and turned around. As he started back west to find a place to sleep, he heard a "clacking" and saw "a rock about the size of [his] fist tumbling" past him on the ground. He looked to where the rock came from and saw Bailey about 20 feet away "winding up to throw another rock." The second rock hit Madrid in the ankle. Madrid was "scared as hell" and pointed his gun at Bailey. Bailey removed a foot-long chain-and-lock from his neck and began swinging it at Madrid as he approached "[l]ittle by little." Madrid thought that Bailey was going to hurt him or kill him. When Bailey got within 10 feet of him, he took a step back, fired his gun, and then immediately ran away up an embankment.

Madrid testified that he did not intend to kill Bailey; he just wanted Bailey to leave him alone. He conceded that he did not warn Bailey or attempt to run away before firing his gun. He believed that Bailey would have caught him. Madrid also admitted that he had used methamphetamine around midday before the shooting.

Evidence was presented that both men had behaved violently in the past. Bailey's daughter testified that he had a short temper and was known to fight. On two occasions around 2005, Bailey attacked his ex-wife when she refused to give him money. He choked her and punched her repeatedly in the

5

face, head, and chest. In 2015, he similarly punched his cousin in the face when she refused to give him money and later attempted to rob a man at gunpoint.

Amanda testified that Madrid was violent with her on several occasions. After he got the gun in August 2022, he became a "bully" and a "monster." During arguments, he tackled her, choked her, threw a lighter at her head, and punched her in the face. One night, Amanda saw Madrid use the gun to rob a man of his chain necklace in Seaport Village. He later choked Amanda because she was not running away fast enough. By the end of the relationship, he was threatening to kill her.

The jury found Madrid guilty of first degree murder and found true the firearm allegation.[3] In a bifurcated proceeding, the court found true the prior serious felony and the prior strike. At the prosecution's request, the court dismissed the aggravating factors.

The trial court granted several defense motions at sentencing. It reduced Madrid's murder conviction to second degree based on insufficient evidence of premeditation and deliberation. (See § 1181, subd. 6.) It also exercised its discretion to impose a lesser firearm enhancement under section 12022.53, subdivision (b), and to strike the prior strike in the interest of justice. It accordingly sentenced Madrid to 15 years to life for the murder,

---

[3] The jury found Madrid guilty of the remaining offenses, except for shooting at an inhabited dwelling (count 5).

consecutive to 10 years for the firearm enhancement and five years for the prior serious felony.[4]

## DISCUSSION

Madrid contends the trial court erred and violated his constitutional rights to due process and a fair trial by instructing the jury on the concepts of mutual combat/initial aggressor (CALCRIM No. 3471) and contrived self-defense (CALCRIM No. 3472) because the instructions were irrelevant and misleading given the evidence in this case. More specifically, he argues the evidence that he pointed his gun at Bailey in their first encounter, outside of the apartment complex, had no bearing on his right to use self-defense because about an hour elapsed before his second confrontation with Bailey. Accordingly, Madrid maintains, any deadly threat he might have initially posed to Bailey was no longer imminent by the time of the second, fatal encounter. We agree these instructions were not supported by the evidence in this case, and instructing the jury on the initial aggressor concept was prejudicial.

## A.    *Additional Background*

### 1.    *Jury Instructions*

The trial court and the parties held their jury instruction conference off the record. Back on the record, the court summarized the instructions it would give, listing them by CALCRIM number. When it reached "3471" and "3472," defense counsel interjected, "Oh, I object to 3472." The court

---

[4]    The court additionally imposed consecutive terms of three years for the assault (count 2) and one year, four months (one-third the midterm) for the residential burglary (count 6), and concurrent terms for the remaining offenses (counts 3, 4, & 7).

responded, "And I will go ahead and give that because, again, it helps explain self-defense."

When the jury reconvened, the court instructed the jury on the law regarding homicide and self-defense. In relevant part, the court told the jury that Madrid was not guilty of murder or manslaughter if he was justified in killing Bailey in self-defense. Madrid acted in lawful self-defense if he: (1) "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury"; (2) "reasonably believed that the immediate use of deadly force was necessary to defend against that danger"; and (3) "used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 505.) The court further instructed that Madrid was guilty of voluntary manslaughter, not murder, if he: (1) "actually believed that he was in imminent danger of being killed or suffering great bodily injury"; and (2) "actually believed that the immediate use of deadly force was necessary to defend against the danger"; but (3) "[a]t least one of those beliefs was unreasonable." (CALCRIM No. 571.) This instruction defined an imminent danger as one that seems "immediate and present" as opposed to "merely prospective or in the near future." (*Ibid.*)

The court went on to instruct on the limits of self-defense. First, it explained that "[a] person who engages in mutual combat or who starts a fight has a right to self-defense only if": (1) "[h]e actually and in good faith tried to stop fighting"; (2) "[h]e indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting"; and (3) in cases of mutual combat, "[h]e gave his opponent a chance to stop fighting." (CALCRIM No. 3471.) The instruction defined "mutual combat" as a fight that "began or continued by mutual consent or agreement" where the

8

agreement, whether express or implied, "occur[red] before the claim to self-defense arose." (*Ibid*.) Second, the court clarified that self-defense may not be contrived—"[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The voluntary manslaughter instruction similarly provided that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." (CALCRIM No. 571.) Finally, the jury was told that "[t]he right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting injury, then the right to use force ends." (CALCRIM No. 3474.)

2. *Closing Arguments*

A theme of the prosecutor's closing argument was that Madrid took every opportunity to use his gun. To that end, she argued that Madrid "came across Mr. Bailey, who used a tone he didn't like, and he pulled out the gun and he racked a round because he wanted an excuse to use it." Because Madrid "contrived this situation with Mr. Bailey looking for an excuse to use that gun," she asserted, there was "no response" by Bailey that could have been "too high" and Madrid "does not get self-defense." The prosecutor suggested the jury could find that Madrid was the initial aggressor because he "without a doubt, takes a verbal argument and turns it deadly" by "pulling out that firearm and racking a round," which justified Bailey in using "any amount of force" against Madrid when, "45 minutes to an hour later, they come across each other again." And since there was no evidence that Madrid

9

communicated his intent to stop fighting, she asserted, he did not have the right to self-defense.

In response, defense counsel argued there was no evidence that Madrid picked a fight with Bailey, a total stranger, intending to use force. She maintained that Bailey was the aggressor, not Madrid, but in any event Madrid did attempt to deescalate the fight by walking away from Bailey after the initial apartment complex altercation.

3.    *Jury Question*

On the third day of deliberations, the jury sent the following note:

A. Can the "initial" agressor be transferrable? [*title of* written above "initial"]

B. Is the initial agressor law negated [*title* written above "agressor"] if the opponent responds with a greater threat

The court and counsel were uncertain as to what the jurors were asking, particularly given their use of the term "transferable." The prosecutor was concerned that CALCRIM No. 3471 might imply that the limitation on the right to self-defense for an initial aggressor only applied to "the defendant" which, she observed, was unfair to Madrid because if the jury believed that Bailey was the initial aggressor, the same limitation applied to his right to use force. The prosecutor therefore suggested a supplemental

10

instruction that essentially stated CALCRIM No. 3471 " 'applies to any party depending on the facts'." Defense counsel objected, noting that the instruction speaks in terms of "a person" rather than "a defendant." She requested a supplemental instruction stating that "a person may use self-defense even if the Prosecutor has proved beyond a reasonable doubt that that person was the initial aggressor so long as the" withdrawal requirements set forth in CALCRIM No. 3471 are satisfied. The prosecutor objected "to this summary of 3471" and asked the court to simply refer the jurors back to the instruction. The court agreed, remarking that it was "just kind of common sense that everybody has a right to self-defense at some point; right?" The court ultimately directed the jurors to "refer back to instruction 3471 for both questions ... ."[5] The jury reached a verdict later that afternoon.

## B.      *Forfeiture*

As a threshold matter, the Attorney General contends the issue is forfeited because defense counsel did not explain the basis for her objection to the contrived self-defense instruction (CALCRIM No. 3472) and did not object at all to the instruction on mutual combat/initial aggressor (CALCRIM No. 3471). Madrid argues the issue is reviewable insofar as the challenged instructions directly undermined his self-defense claim and thus impaired his substantial rights. (See § 1259.) Alternatively, he claims defense counsel rendered ineffective assistance in failing to fully object to both instructions. We must address Madrid's contention on its merits to determine whether

---

[5]      The court also sent back a modified version of CALCRIM No. 3471 to clarify that the requirement that a person give his opponent a chance to stop fighting only applies in cases of mutual combat.

11

there was an impairment of his substantial rights or ineffective assistance of counsel. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

## C.    *Instructions Must Be Supported by the Evidence*

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*Ibid*.) The corollary to this mandate is equally well-established: "a trial court is not obligated to give an instruction if the evidence presented at trial is such as to preclude a reasonable jury from finding the instruction applicable." (*People v. Schultz* (1987) 192 Cal.App.3d 535, 539 (*Schultz*).) Indeed, it is error to give a jury instruction that is legally correct but has no application to the facts of the case. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).)

Giving an inapplicable instruction is subject to the traditional *Watson*[6] test for prejudice, under which "reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton*, *supra*, 4 Cal.4th at p. 1130, citing *Watson*, *supra*, 46 Cal.2d at p. 836.) Such an error "is generally ' "only a technical error which does not constitute ground for reversal" ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67) because juries are fully capable of analyzing the evidence, determining the facts, and realizing that an instruction does not apply (*Guiton*, at p. 1126). Indeed, juries are routinely told that "[s]ome of these instructions may not apply, depending on your findings about the facts of the

---

6    See *People v. Watson* (1956) 46 Cal.2d 818, 836.

case" and are directed to "follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200; see *Cross*, at p. 67 [analogous CALJIC instruction].) That being said, in some cases, the presence of an extraneous instruction may be confusing enough to become prejudicial. (See *Schultz*, *supra*, 192 Cal.App.3d at pp. 539–540.)

Here, Madrid contends that the instructions on contrived self-defense (CALCRIM No. 3472) and mutual combat/initial aggressor (CALCRIM No. 3471) were legally correct in the abstract but should not have been given in this case based on the evidence. We consider the three concepts in turn.

## D. *Contrived Self-Defense (CALCRIM No. 3472)*

As noted, the contrived self-defense instruction stated that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The prosecutor argued that this concept applied based on evidence that Madrid was emboldened to commit crimes after getting a gun—for instance, around the time of the shooting, he assaulted Amanda, robbed a man in Seaport Village, and burglarized a car. She suggested that Madrid "wanted an excuse to use" the gun, so he pulled it out and racked a round when Bailey "used a tone" he did not appreciate. In response, defense counsel urged the jury to consider "the 50-pound differential," Bailey's drug use, and the fact that these men were strangers. In light of those facts, she asserted, "It is not contrived. He didn't go out and pick a fight with Mr. Bailey. No. They had an aggressive encounter; right. They had that first encounter at that apartment complex. And at that apartment complex, at the bottom of that hill, the objective video evidence shows that [Madrid] walked away. [Madrid] told Mr. Bailey 'Back the fuck off.' "

13

We agree with Madrid that the instruction on contrived self-defense was not supported by the evidence, but conclude the error was harmless. Given these proffered interpretations on the potential applicability of contrived self-defense, the jury was surely able to see how only the latter (the defense version) comported with the evidence. Again, the evidence was undisputed that Bailey approached Madrid, Madrid pointed his gun at Bailey and told him to get away, Bailey complied, and then Madrid walked away. While Madrid may have been eager to pull out his gun, the evidence showed that he did so to *end* the confrontation with Bailey, whom he perceived to be aggressive, *not to provoke him further*. And as to the first encounter, he did so successfully. Because contrived self-defense was plainly inapplicable, it is not reasonably likely the jury relied on it to reject the self-defense claim.

### E. *Mutual Combat (CALCRIM No. 3471)*

We similarly conclude that the concept of mutual combat was irrelevant, but the error in instructing the jury was obviously harmless. The trial court instructed that "[a] person who engages in mutual combat ... has a right to self-defense only if" he withdrew from the fight. (CALCRIM No. 3471.) "Mutual combat" was defined as a fight that "began or continued by mutual consent or agreement" where the agreement, whether express or implied, "occur[red] before the claim to self-defense arose." (*Ibid.*, italics omitted.)

The jury was fully capable of realizing there was no such agreement in this case. Again, the evidence showed that Bailey—a stranger—unexpectedly confronted Madrid. In the first instance, he aggressively approached Madrid and demanded access to the apartment complex, and in the second, he threw rocks at Madrid and then came at him with the chain-and-lock. Madrid did

14

not invite or welcome these interactions.  Rather, he used his gun in an effort to end the encounters.  Indeed, the prosecutor never mentioned mutual combat in closing arguments.  We therefore discern no likelihood that the jury found Madrid was engaged in mutual combat when he shot Bailey.

## F.    *Initial Aggressor (CALCRIM No. 3471)*

We cannot dispense with the initial aggressor instruction so easily.  This instruction provided that "[a] person ... who starts a fight has a right to self-defense only if" he (1) "actually and in good faith tried to stop fighting" and (2) "indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting."  (CALCRIM No. 3471.)  More to the circumstances of this case, the instruction also described the concept of sudden escalation:  "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."  (*Ibid.*)

At first blush, if one construes "defendant" more broadly to refer generally to a participant, this instruction appears obliquely supported by evidence that Madrid escalated the level of violence.  On this point, the prosecutor argued:  "So was Mr. Madrid the initial aggressor?  That's up for you to decide.  They get into an argument at the gate, whether you believe it is on the same side of the gate or the other side of the gate.  Mr. Madrid, without a doubt, takes a verbal argument and turns it deadly; right.  By pulling out that firearm and racking a round.  You cannot pull a gun on

15

someone for yelling at you."  To be sure, although the undisputed evidence showed that Bailey affronted Madrid by demanding access to the apartments, Madrid's response—racking a round and pointing his gun at Bailey—*could have* justified Bailey in subsequently responding to Madrid with deadly force, depending on the circumstances.  To illustrate, assume Bailey is the "original aggressor" and Madrid is "the victim" in the following passage from Witkin:

> "Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force ... .  If the victim uses excessive force, the aggressor's right of self-defense arises. … Ordinarily the original aggressor must first attempt to withdraw.  'If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense.' "  (1 Witkin, Cal. Crim. Law (5th ed. 2026) Defenses, § 87.)

But there are two problems here.  First, the paragraph the jury received on sudden escalation was written in terms of a *defendant* initiating an altercation with nondeadly force, the victim responding with deadly force, and then the defendant using deadly force in return.  But the evidence here suggested a different scenario, in which (arguably) *the victim* initiated with nondeadly force, the defendant responded with deadly force, the victim subsequently used deadly force, and then the defendant used deadly force in return.  In other words, the standard language did not quite fit the facts here.

Second, and more to the point, we agree with Madrid that no reasonable jury could find the initial aggressor concept applicable—even with

16

tailored sudden escalation language—given the timelapse between the two encounters.  The reason that a defendant forfeits his claim to self-defense when he initiates a deadly attack is because the victim is then legally justified in using deadly force against the defendant.  (See *In re Christian S.* (2015) 7 Cal.4th 768, 773, fn. 1 (*Christian S.*) [self-defense and imperfect self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"]; see also *People v. Vasquez* (2005) 136 Cal.App.4th 1176, 1179–1180 [imperfect self-defense "is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant"].)

But no one is justified in using deadly force absent fear of imminent death or great bodily injury.  (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 ["for either perfect or imperfect self-defense, the fear must be of imminent harm"].)  And regardless of how Bailey perceived the threat Madrid posed when Madrid first racked a round in his handgun, no rational jury could find that Bailey feared imminent harm when he voluntarily reengaged Madrid at a significantly different time and place.  The evidence was undisputed that, after Madrid pointed the loaded gun at Bailey, the men parted ways.  About an hour later and a half mile away, Bailey again spotted Madrid, who was looking for a place to sleep and was otherwise unaware of Bailey's presence.  While Madrid was 20 feet away and looking in another direction, Bailey started hurling rocks at him.  On this record, no rational trier of fact could find that Madrid posed an imminent threat to Bailey at that latter point in time.  Accordingly, Madrid's conduct during the first

17

encounter did not limit his self-defense claim; he did not have a duty to withdraw during the second encounter.

Thus, the ultimate question before us is whether there is a reasonable likelihood Madrid would have obtained a more favorable result—a voluntary manslaughter conviction, at least—absent the wrongly given initial aggressor instruction. In other words, we must decide whether there is a reasonable probability the jury would have found Madrid actually believed he needed to defend himself from imminent death or great bodily injury (see *Christian S.*, *supra*, 7 Cal.4th at p. 773) but for the inapplicable instruction. We conclude there is such a likelihood. The prosecutor explicitly argued that Madrid only had a limited right to self-defense because of his conduct during the first interaction, despite the passage of time: "Mr. Madrid started this fight *45 minutes before.* You need to tell Mr. Bailey that you are not interested anymore if you want to now claim self-defense. Because Mr. Bailey is, like, that's the guy who racked a round and pointed a gun at me. That's deadly force. [¶] *Mr. Bailey can use any amount of force.* Self-defense goes both ways. You come across the same individual *45 minutes later* who racked a round and pointed that gun in your face from feet away, *there's nothing that you cannot do* to make sure that that individual does not come in contact with you again." (Italics added.) Invoking parallel language in the voluntary manslaughter instruction stating that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force" (CALCRIM No. 571), the prosecutor noted this limitation applied equally to imperfect self-defense.

To be sure, the jury was generally instructed that to be "imminent," a danger "must seem immediate and present, so that it must be instantly dealt with" (CALCRIM No. 571), and that "[t]he right to use force in self-defense

18

continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting injury, then the right to use force ends" (CALCRIM No. 3474). Jurors conceivably could have applied these principles to reject the prosecutor's argument and conclude that Bailey had no right to start the second altercation because any threat Madrid posed had long dissipated. But there were no instructions untangling the concepts of imminence, initial aggressor, and the victim's right (or lack thereof) to self-defense. And defense counsel never argued that Bailey had no right to self-defense because he no longer faced imminent danger. She contended instead that Madrid was not the aggressor in either the first or second instance.

Moreover, the jury's note—asking whether "the title of 'initial' aggressor" is "transferrable" and whether it is "negated if the opponent responds with a greater threat"—while ambiguous, suggests it was struggling to understand how to apply the initial aggressor concept to the evidence in this case, which involved multiple exchanges and escalating violence. As Madrid points out, it is possible that the jury was contemplating whether the "initial aggressor" designation transferred from the first encounter to the second. The court's response to the note, simply referring the jury back to CALCRIM No. 3471, did not provide much clarification. And the fact that the jury reached a verdict just a few hours after receiving the court's response signals that this concept may have been an important part of deliberations. Minimally, the note indicates that the jury did not simply ignore the instruction upon finding that Madrid was not the initial aggressor.

Defense counsel also suggested that, even assuming Madrid was the initial aggressor, he withdrew by walking away from Bailey. But the prosecutor asserted this was insufficient because Madrid did not

19

communicate his intent to withdraw *during the second encounter* by running away, saying no, putting up his hands, or saying, " 'I don't want to fight anymore. I'm not interested. I was mad at you last time when I pulled the gun, but I don't want to engage.' " Because Madrid conceded he did not try to run away or say anything to Bailey during the second incident, we cannot say the jury likely found that Madrid withdrew even if it deemed him the initial aggressor.

At the same time, Madrid presented a viable imperfect self-defense claim. He testified that when he realized Bailey was throwing rocks at him, he pulled out his gun and pointed it at Bailey, expecting Bailey to leave like he did the first time. Instead, Bailey continued toward him swinging a foot-long chain-and-lock. Madrid thought Bailey was going to kill him because Bailey knew he had a gun but was "coming for [him]" anyway. While Madrid is no model citizen and his credibility is far from unassailable, we must acknowledge that his account is corroborated by objective evidence that Bailey followed him east down Adobe Falls Road, was larger than Madrid, and was found lying beside a chain and lock. Amanda also testified that Madrid claimed self-defense when he told her about the shooting.

To the extent the Attorney General contends that any error in instructing the jury on the limits of self-defense was harmless since the jury found Madrid guilty of first degree murder, we note that killing in self-defense is not necessarily inconsistent with premeditation and deliberation. (See *People v. Schuller* (2023) 15 Cal.5th 237, 265 (conc. opn. of Liu, J.).)

On this record, we discern a reasonable likelihood that at least one juror would have accepted that Madrid actually believed he needed to defend himself from imminent death or great bodily injury, but was misled into thinking Madrid lost his right to make that claim since he pulled the gun

20

on Bailey an hour earlier, and he did not communicate an intent to stop fighting during the second, fatal encounter. We therefore conclude that giving the initial aggressor instruction was prejudicial, and accordingly reverse the murder conviction.

## DISPOSITION

The judgment is reversed as to the murder conviction and affirmed in all other respects. The matter is remanded to allow the People an opportunity to retry Madrid for murder with proper instructions.

DATO, Acting P. J.

WE CONCUR:

DO, J.

KELETY, J.